In the Matter of O'NEILL, Tracy Allen, a child under the age of 18 years, to-wit, 2 years.

**William A. RUSSELL, Appellee,**

v.

**Russell O'NEILL, Appellant.**

**William A. RUSSELL, Appellee,**

v.

**Susan R. O'NEILL, Appellant.**

**Nos. 47972 and 47980.**

Court of Appeals of Oklahoma, Division No. 2.

July 27, 1976.

Released for Publication by Order of Court of Appeals Aug. 19, 1976.

Grady S. Cornett, Tulsa, for appellee William A. Russell.

Lawrence D. Taylor, Tulsa, for appellant Russell O'Neill.

William T. Drapala, Byron S. Matthews, Tulsa, for appellant Susan R. O'Neill.

PER CURIAM.

Susan and Russell O'Neill were married on May 16, 1970. Three children were born of the union. This proceeding is concerned with the welfare of the couple's second child, Tracy Allen O'Neill, born on May 17, 1972.

The action was initiated on June 4, 1974, when William A. Russell, appellee, filed a petition which, as amended, prayed that the child be declared dependent and neglected and the parental rights of Susan and Russell O'Neill be terminated. In part, the amended petition states:

"[T]hat most of the past two years he [the child] has lived with the petitioner, the last time since July 15, 1973; that prior to that time several months with his daughter, Georgie Conway also other persons; that the mother, Susan O'Neill has not paid this petitioner or his daughter for any expenditures for food, clothing, shelter and the child needed medical attention when she left him on July 15 of last year and the petitioner has provided medical assistance for him; that she has only seen him once since leaving him with said petitioner on July 15, 1973; that for the short period of time that the mother, Susan O'Neill had custody she did not take care of said child properly . . . ; that she continues to live and to have sexual relationships with other men besides her husband . . . ; that such home of said Susan O'Neill, is an unfit place for said child; . . . that said Russell O'Neill has not contributed any support to this petitioner and paid any expenses for food, clothes, shelter and medical expenses."

By court order petitioner William A. Russell was given custody of the child.

The matter was heard by referee Don E. Williams on August 21 and 28 of 1974. Following presentation of evidence by petitioner, both parents filed separate demurrers thereto which were overruled. After the parents had presented their case, the referee made findings of facts and recommendations as follows:

"[T]he Referee finds the above named child to be a dependent and neglected

child by reason of lack of parental care and guardianship; the Referee further finds that Susan R. O'Neill, mother of said child, has abandoned said child and that said Susan R. O'Neill's parental rights to said child are terminated; that said child is made a ward of the Court and is placed into the temporary custody of Mr. and Mrs. William A. Russell; and further, Mr. Russell O'Neill, father of said child, is to have reasonable visitation privileges."

Appeal was made by Susan and Russell O'Neill to the district court from the findings and recommendations of the referee. On October 24, 1974, the district court entered an order confirming the referee's findings and recommendations. From this order the parents have separately appealed —Russell O'Neill in case number 47,972; Susan O'Neill in case number 47,980. The appeals have been consolidated and both are dealt with in this opinion.

### I

We will first examine the trial court's determination that the child, Tracy Allen O'Neill, is a dependent and neglected child. The statutory definition of the phrase "dependent or neglected child" is found in 10 O.S.1974 Supp. § 1101(d), which states:

"The term 'dependent or neglected child' means a child who is for any reason destitute, homeless or abandoned; or who is dependent upon the public for support; or who has not the proper parental care or guardianship; or whose home, by reason of neglect, cruelty, or depravity on the part of his parents, guardian or other person in whose care it may be, is an unfit place for such child; or who is in need of special care and treatment because of his physical or mental condition, and his parents, guardian or legal custodian is unable to provide it; or whose parent or legal custodian for good cause desires to be relieved of his custody; or who is without necessary care or

support through no fault of his parents, guardian or custodian. Provided, however, no child who, in good faith, is being provided with treatment and care by spiritual means alone in accordance with the tenets and practice of a recognized church or religious denomination by a duly accredited practitioner thereof shall, for that reason alone, be considered to be a dependent or neglected child under any provision of this act."

Further, the case of *In re Sweet*, Okl., 317 P.2d 231 (1957) says:

"As respects the determination of whether the children are 'neglected', the word 'neglect' has been defined as the disregard of duty, owing to indifference or wilfulness."

In the instant case the trial court made the determination that the infant, Tracy Allen O'Neill, was a dependent and neglected child upon the basis that the natural parents had not provided the child with the proper parental care. It is the contention of the two appellants in their separate appeals that this is an erroneous conclusion; each contends the facts do not justify a finding that this child is dependent and neglected.

The hearing before the referee in August of 1974 brought out the following facts. Those witnesses called by appellee William A. Russell testified to a pattern of conduct by Susan O'Neill whereby she would leave Tracy for weeks or months with various individuals, providing little, if any, assistance and would rarely visit the infant.

The child was born on May 17, 1972. At this time Susan's husband, Russell O'Neill, was in the service and stationed overseas. During part of the first two weeks after birth the child was left with a Mrs. Harvey. For most of the next month, June of 1972, Tracy was cared for by Cindy Cox. Cindy Cox testified that she quit taking care of Tracy near the end of June "because he was sick and nobody

would take him to the doctor, and he was just so sick. I was afraid he was going to die." When Cindy Cox returned the child to Susan O'Neill she placed him with a Mrs. Six for a week.

Commencing in July of 1972 and continuing through November of that year, Susan entrusted appellee's daughter, Georgie Conway, with care of the child. Susan was working from 2 to 10 p. m. as a cashier, waitress and dishwasher at a local restaurant at this time. The agreement was that Susan would pick up Tracy every night after work. However, according to Georgie Conway, Susan took the child home only once or twice during the entire five-month period. On a few occasions Susan did provide food and milk for the baby.

On Thanksgiving Day of 1972, Georgie took Tracy with her to visit her father, William A. Russell, and his wife in Tulsa. Mr. Russell, who had previously raised two adopted children and one foster child, testified that he immediately fell in love with the infant. Georgie let the child stay with her father for the weekend and he returned Tracy to Georgie in Salina, Oklahoma, that Sunday. At that time Mr. Russell inquired whether the mother would consider allowing him to adopt the child.

At the end of November, 1972, Susan O'Neill retrieved Tracy from Georgie Conway's home. During the next three months the child was, apparently, cared for primarily by its mother, although Cindy Cox and Mrs. Six did have the child for portions of this interval.

In March of 1973, Mr. Russell next saw the child when Susan O'Neill decided to permit him to care for Tracy. On March 3, 1973, Mr. Russell picked up Tracy at Locust Grove, Oklahoma, and brought him to his home in Tulsa. At this time, according to William Russell's testimony: "I told her [Susan O'Neill] we would take care of the child absolutely, and if anything happened to me, I would have an insurance program set up to assure the child's education into his adulthood."

In June of 1973, Susan's husband, Russell O'Neill, came home on leave. When he discovered the whereabouts of Tracy, he went to visit with the Russells and to see his son. He asked that custody of the child be given to him, but the Russells refused to relinquish possession of the child to its father. Russell O'Neill thereafter initiated a habeas corpus action in the district court to obtain custody of Tracy. During this period the O'Neills were "separated" and Susan O'Neill did not appear at the first hearing on the matter. She did appear at the subsequent hearing, however, and at that time the couple testified that they were reconciling. The action culminated with Russell O'Neill prevailing on July 12, 1973, and the child was returned to the O'Neills. The O'Neills' attempted reconciliation was not successful, however; and on July 15, 1973, Susan O'Neill returned with the child to the Russells. On July 19 or 20, Russell O'Neill, his leave having ended, returned to Kentucky unaware that his wife had returned the child to the custody and care of the Russells.

Susan O'Neill stayed with the Russells about one week after she returned Tracy to them. Although she supposedly gave her consent to adoption by the Russells she would not or did not sign any consent papers as requested by the Russells.

From July 15, 1973, until the filing of this action, the child remained in the custody of the Russells. During this period, the child was visited only one time by its mother. That occasion was Christmas Eve of 1973, when Susan appeared at the Russells with several of her relatives. The Russells, however, allowed only Susan to see Tracy, the others remaining outside the house.

Finally, there was testimony from an individual who lived with Susan O'Neill a considerable time while her husband was

away in the service. The only testimony he gave, however, relevant to this proceeding concerned his admission that they engaged in sexual intercourse in the presence of the infant.

Susan O'Neill's version of what transpired from the birth of Tracy to the present differs markedly from the portrayal presented by appellee's witnesses. Susan contends she cared for Tracy from his birth in May 1972 until she gave him to the Russells to care for in March of 1973. While she did employ "voluntary babysitters," Susan O'Neill claims that she paid them to the best of her ability; that she provided them with food, milk, and diapers; and that she always picked Tracy up after work, except on those occasions when she worked a double shift at the restaurant.

She says that her reasons for giving up Tracy to the Russells were that Tracy was sickly, needed medical help, and that her economic plight required her to work and prevented her from providing all that Tracy needed. Although at one time she considered allowing the Russells to adopt Tracy, she subsequently changed her mind and had so informed William Russell. Also, appellant mother put on evidence that she has two children at home with her now; that she adequately provides and cares for them; and that during those months she had Tracy, he was well cared for by her.

The child's father, Russell O'Neill, testified that throughout most of the time span with which this case is concerned, he was in the service and away from Oklahoma and the child unavoidably. He offered proof that he had provided, since Tracy's birth, funds to his wife Susan for the care and support of the child. Mr. O'Neill admits he was still in Oklahoma on leave in July of 1973 when his wife returned Tracy to the Russells three days subsequent to his successfully obtaining custody via the habeas corpus action. He asserts he was unaware of Tracy's whereabouts during this

time and assumed he was staying with one of his wife's relatives.

He says he repeatedly tried to convince his wife to come with the children and stay with him in Kentucky, where he was stationed, and that she refused to do so. After he returned to Kentucky, he remembers only once inquiring as to Tracy's well-being.

In April of 1974, Russell O'Neill was discharged from the service. He went to Florida, where he is currently employed in a feed store and lives in a mobile home across the road from the residence of his mother. If given custody of Tracy, he would take him to his home in Florida. Both Susan and Russell O'Neill state that they intend to obtain a divorce.

## II

Susan R. O'Neill contends that by placing the child in the home of the Russells she has provided the child with the best possible care under the circumstances. As per the agreement of the parties, she alleges, she did not thereafter provide the child with support. Because of the temporary inability to properly care for the child, she asserts, she should not be declared to have failed to provide the proper parental care so as to make the child dependent or neglected.

In support of her position, Susan O'Neill relies heavily upon the case of *In re Vilas*, Okl., 475 P.2d 615 (1970). In the *Vilas* case the Oklahoma Supreme Court reversed a finding by the trial court that a two-year-old girl was a dependent and neglected child. The mother in *Vilas*, who had custody of the child, experienced emotional problems as the result of two "bad marriages" and had, consequently, been receiving psychiatric help. Immediately after her second divorce, she placed her daughter in the care of her parents. The child's grandparents, however, were not well and as a result the child was eventually left with another family, petitioners,

who were long-time friends of the grand-parents and had offered their assistance. This family kept the infant for 18 months. The grandparents visited the child once a week; the mother, on the average of once a month.

Thereafter, the natural mother took custody of the girl, but after nine weeks she again asked petitioners to care for the child. At this point, proceedings were brought which resulted in the aforementioned decision of the trial court. In reversing the finding of the trial court that the child was dependent and neglected, the court said:

"In the present case there is no evidence that the mother Cheryl was guilty of disregard of her duty, 'owing to indifference or willfulness.' We are convinced that the arrangement whereby Lisa was placed with [petitioners] was purely the result of the long and close personal relationship between them and the Smith family, and that it should not be construed as a renunciation of Lisa, or as evidencing a lack of interest in her welfare, on the part of either Cheryl or her parents, Mr. and Mrs. Smith."

Appellant Susan O'Neill's assertion that the *Vilas* case controls is not persuasive, however, as that case is factually distinguishable from the instant situation. The *Vilas* decision concerned itself with: (1) the inability of the natural parent to presently provide for the child; (2) the fact that the child was placed with responsible people whom the parent had known and who were close friends of the family for many years; and (3) the fact that the mother, and her parents, frequently visited the child and apparently demonstrated some degree of interest and concern regarding her care and general well-being. While Susan O'Neill did present evidence relating to her inability to properly provide for the child owing to her general economic position and the necessity that she work, this position was damaged somewhat by the testimony of her husband that he had been sending her money monthly for the child's support. Here also, the child was given presumably to anyone who would take him. If, as it appears from the record, the child was well cared for by the various individuals who were entrusted with, or had thrust upon them, the care of the child, it was not because appellant mother chose trusted and long-time friends, but rather by pure chance. Finally, unlike *Vilas,* we have in the instant case a situation where under the evidence it can fairly be stated that the mother rarely saw her child while he was in the custody of others. In fact, there is testimony from which it can be concluded that the mother did not, in some instances, see the child for weeks and even months at a time when, according to the testimony of the "voluntary babysitters," they had been led to believe they were only to look after the infant for the day while the mother was at work.

In the case of *In re Reed,* 189 Okl. 389, 117 P.2d 503 (1941) it is stated:

"The mere fact that [the child] was enjoying proper care in the home of others and was therefore not a homeless, destitute or abandoned child does not mean that it was receiving proper parental care or guardianship."

Simply because others, out of compassion for the child, assumed those duties which the mother chose to shirk does not mean that a child is not dependent or neglected. Here the evidence clearly points to the conclusion that Tracy O'Neill was not receiving from his mother, Susan O'Neill, the proper parental care or guardianship as the term is used in 10 O.S.1974 Supp. § 1101(d) in defining a dependent or neglected child.

### III

Appellant father, Russell O'Neill, also appeals the trial court's order, stating:

"The appellant's past physical separation from his family due to military service and his poor communication with his

family due to strained marital relations were insufficient grounds upon which to find one of his three children a dependent and neglected child and deny him custody from an unrelated third party seeking adoption, especially in light of the fact he financially supported the child through the period of his unavoidable absence."

Appropriate here is the statement of the referee who, in announcing his holding from the bench on August 28, 1974, remarked:

"Now, as to the father's actions, I think there is a great deal to be taken in the mitigation concerning the efforts that he has put out, primarily due to the fact that he for the majority of time was either unaware of the facts or, two, that he was unaware of the facts by reason of his military service. The Court specifically notes that the evidence adduced at trial of this matter showed, in fact, that Mr. O'Neill did on a continuing basis support this child financially, but I think a parent's responsibility goes beyond merely providing financial support for a child. For example, had there been evidence of a continuing effort on Mr. O'Neill's part to see this child and to exercise his parental responsibilities in terms of emotional care of the child, I would be hard-pressed, I think, to make the decision that I am making, but that evidence is not before me. Therefore, I find also with respect to Mr. O'Neill's actions that the child is a dependent child in that Mr. O'Neill has also failed to provide the proper parental care and guardianship to Tracy O'Neill."

We concur with the finding of the trial court and referee that Russell O'Neill did, by his payments for support and his action in regaining custody of Tracy in July of 1972, demonstrate a certain willingness to assume his parental responsibilities. However, his conduct subsequent to July 12 1972, when he regained custody of Tracy

from the Russells, shows little or no continuation of a parental interest.

First, on July 15, 1972, Susan O'Neill returned Tracy to the Russells. Russell O'Neill did not leave for Kentucky until, by his own testimony, July 19 or 20. During this four or five-day period, he did not know, and made no search or inquiry to ascertain, the child's whereabouts.

Second, although fully cognizant of the past behavior pattern of his wife regarding care of the child, Russell O'Neill left the child in her care in Oklahoma when he returned to Kentucky, having taken no steps to assure that the same treatment would not again befall Tracy.

Third, a reasonable reading of the record discloses that from July 1972 until June 1973 Russell O'Neill inquired only once about his son Tracy.

Finally, Russell O'Neill did not, after his April 1974 discharge from the service, make any inquiries or attempts to discover the welfare of his child. It was not until this action was filed, with the intent of terminating his parental rights, that he again showed any interest in the child.

While he may have been unaware of the care being provided for his child, and while this may have been in part attributable to the physical separation, the primary reason for appellant Russell O'Neill's lack of awareness of events concerning his son was his failure to make even the most cursory attempts to discover such information.

Accordingly, the finding of the trial court that appellant Russell O'Neill has failed to give the child the essential parental care and guardianship is not clearly against the weight of the evidence and the judgment of the trial court declaring Tracy O'Neill a dependent and neglected child is therefore affirmed.

IV

Lastly, we must determine the correctness of the trial court's order terminating

the parental rights of the mother, Susan O'Neill.

Termination of parental rights in this instance is governed by 10 O.S.1971 § 1130. The trial court found that the mother had abandoned the child on March 3, 1973, when she left him with the Russells, and that the abandonment continued through the filing of the petition in this case on June 4, 1974, a period of fifteen months. Section 1130(b) permits termination if there is a finding that "a parent who is entitled to custody of the child has abandoned it for one (1) year."

In conceding that there was not evidence of a continuous abandonment for a full year, appellee embraces definitions of the terms "continuous" and "abandonment" which we are not prepared to accept.

■ The mother participated in a second habeas corpus hearing, though it is disputed whether she did so voluntarily or as a result of duress by her husband. But was this an exercise of a parental duty or merely the exercise of a parental right? Only three days after the writ was granted, she returned the child to appellee, saying she would let appellee Russell adopt him. She made no attempt to visit or even inquire about the child between July 15 and December 1973; and on the occasion of the latter visit, it again is not clear that she was attempting to get the child in order to perform a parental duty. Thereafter, she did nothing further to evince a settled purpose to assume her parental duties or to even enforce a parental right with regard to the little child until this action was filed. Her parental conduct toward this child since its birth has indeed strongly implied a settled purpose to shirk her parental duties and forsake parenthood. Appellant mother's token expressions of parental duty, if indeed they can be so characterized, seem to us to be of no more consequence than a father's contribution of five dollars to his child once a year to avoid having his parental rights terminated for failure to support. While the one-year abandonment period must be continuous, such period will not be considered as having been interrupted by insubstantial performance of parental duties or exercise of parental rights.

■ We agree with the Arizona Court of Appeals that the concept of abandonment of a child by a parent must be left somewhat elastic and to a large extent considered a question of fact for trial court determination. *Anonymous v. Anonymous,* 25 Ariz.App. 10, 540 P.2d 741 (1975). In the final analysis, the child's welfare must occupy a prominent position. The mother's conduct here demonstrated a conscious disregard of the obligations she as a parent owed her child to such an extent that the court could find the parent-child relationship had been destroyed. This comports with the definition of abandonment devised by the Alaska Supreme Court [1] and one we think conveys the meaning of the term as used in § 1130(b).

The finding of abandonment by the trial court is not clearly against the weight of the evidence.

Affirmed.

BACON, P. J., and BRIGHTMIRE, J., concur.

NEPTUNE, Judge (concurring in part and dissenting in part).

I concur except as to the sustention of the finding of abandonment. The initial placing of the child with appellee by Susan O'Neill, in March of 1973, was without intention of relinquishing her parental claims. In July of 1973, appellant sought and obtained custody through habeas corpus. In December of 1973, she again sought to have the child returned to her. And in June of 1974, appellant mother made oral motions in open court seeking to be restored to custody. Though the expressions of interest and the offer of pa-

1. *D. M. v. State,* Alaska, 515 P.2d 1234 (1973).

rental care by the mother were meagre, they tend to refute the conditions required for a finding of abandonment as I view it. I would affirm the trial court except as to the order terminating the parental rights of appellant Susan O'Neill.